# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

|  |  |
|---|---|
| Records and information associated with the cellular device assigned (312) 568-6998 that is in the custody or control of Sprint, a wireless communications service provider that is headquartered at 6391 Sprint Parkway, Overland Park, KS 66251. ) ) ) ) ) ) | Case No. 20-897M(NJ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, Section 841(a)(1)

The application is based on these facts: See attached affidavit.

☒ Delayed notice of _____ days (give exact ending date if more than 30 days: __August 3, 2020__ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Kathrine L. Kelley_
*Applicant's signature*

FBI Special Agent Kathrine L. Kelley
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: _February 3, 2020_

_Judge's signature_

City and State: Milwaukee, Wisconsin

Hon. Nancy Joseph U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Kathrine L. Kelley, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call numbers **(773) 569-6945 ("Target Cell Phone #1")** and **(312) 568-6998 ("Target Cell Phone #2)**. **Target Cell Phone #1** has no subscriber information, but is known to be used by CURLEE J. ASHFORD (date of birth: XX/XX/1966), whose service provider is Locus Telecommunications, LLC, (the "Service Provider") a wireless telephone service provider headquartered in Fort Lee, New Jersey. **Target Cell Phone #2,** having subscriber Juan Gonzalza, but is known to be used by CURLEE J. ASHFORD, whose service provider is Sprint, (the "Service Provider") a wireless telephone service provider headquartered in Overland Park, Kansas. **Target Cell Phone #1** and **Target Cell Phone #2** are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of

1

an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the **Target Cell Phone #1** and **Target Cell Phone #2**.

3.      I am a Special Agent with the FBI and have been since May of 2019. I have been assigned to the Southeastern Wisconsin Regional Gang Task Force since October of 2019. Prior to being employed as a Special Agent with the FBI, I was employed as a Staff Operations Specialist for the FBI for approximately nine years. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. Section 2510(7), in that I am empowered by the law to conduct investigations of and to make arrests for federal felony arrests.

4.      As a Special Agent, I have participated in the investigation of narcotics-related offenses, resulting in the seizure of illegal drugs, weapons, United States currency, and other evidence of criminal activity. As a narcotics investigator, I have interviewed individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in several aspects of drug investigations, including physical surveillance, execution of search warrants, undercover operations, court-ordered wiretaps, analysis of phone and

2

financial records, and the arrests of numerous drug traffickers. Additionally, I have spoken with other experienced narcotics investigators on numerous occasions concerning the method and practices of drug traffickers and money launderers. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

5.      The facts in this affidavit come my personal observations, my training and experience, my review of documents, and information obtained from other law enforcement agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, Untied States Code, Sections 841(a)(1) (distribution of and possession with the intent to distribute controlled substances) have been committed, are being committed, and will be committed by CURLEE J. ASHFORD (XX/XX/1966). There is also probable cause to believe that the location

3

information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of other individuals who are engaged in the commission of these offenses.

7.      The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

8.      The United States, including the FBI and the FBI's Southeastern Wisconsin Regional Gang Task Force, are conducting a criminal investigation of CURLEE J. ASHFORD regarding possible violations of Title 21, United States Code, Section 841(a)(1) (distribution of and possession with intent to distribute controlled substances).

9.      In October of 2019, case agents interviewed a confidential source (CS #1). CS #1 stated "BUG" is a Gangster Disciple gang member with ties to Chicago, Illinois. CS #1 indicated "BUG" sells heroin from his apartment, which is located at 834 N. 34th Street Apt. 203. Additionally, CS #1 stated "BUG" holds at least 100 grams of heroin at a time. CS #1 advised s/he could make a controlled buy of heroin from "BUG."

10.     Based upon my training and experience, I know that a "controlled buy" (and/or controlled contact) is a law enforcement operation in which a confidential source purchases drugs from a target. The operation is conducted using

4

surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a confidential source is used, s/he is searched for contraband, weapons, and money before the operation. The confidential source is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the confidential source meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The confidential source is again searched for contraband, weapons, and money. A sample of the suspected drugs is then field tested by case agents for the presence of controlled substance and then placed in inventory pursuant to normal inventory procedures. Telephone calls to the target by the confidential source are consensually recorded calls under the direction and control of case agents and made in the presence of case agents.

11.     On October 18, 2019, case agent showed a single Milwaukee Police Department booking photograph of CURLEE J. ASHFORD (DOB: XX/XX/1966) to CS #1. The photograph was unlabeled and contained no identifying information. CS #1 positively identified the photograph as the person CS #1 knew as "BUG."

12.     Case agents believe CS #1 is reliable and credible. First, CS #1 has provided information since October 2019. Second, CS #1's information is consistent with case agent's knowledge of violent gang subjects in Milwaukee, Wisconsin. Furthermore, substantial portions of CS #1's information has been corroborated by controlled drug purchases, money deliveries, and consensually recorded phone calls with ASHFORD, as well as through independent investigation, including

5

surveillance and information from other sources. CS #1 is cooperating with law enforcement to obtain consideration from the Milwaukee County District Attorney's Office for pending charges related to narcotics trafficking. CS #1 is a convicted felon with prior obstruction, carrying a concealed weapon, and possession and distribution of narcotics convictions. For these reasons, case agents believe CS #1 to be reliable.

13.     On December 18, 2019, case agents interviewed CS #1. CS #1 stated s/he bought heroin from "BUG" between thirty-seven to forty times over the last five years. CS #1 stated s/he purchased approximately twenty-five to fifty grams of heroin each time. In addition, CS #1 stated s/he purchased larger quantities, over 100 grams, of heroin on two occasions. Additionally, CS #1 stated "BUG" keeps the heroin in the oven of his apartment and has seen guns in "BUG's" apartment. According to CS #1, "BUG" obtains his heroin from his supplier, "MAGGIE," from Chicago, Illinois. CS #1 stated "MAGGIE" sometimes delivers the heroin to "BUG" in Milwaukee, Wisconsin when "BUG" needs a larger supply, over 100 grams, of heroin. CS #1 provided phone numbers of **(773) 569-9645**, or **Target Cell Phone #1,** and **(312) 568-6998**, or **Target Cell Phone #2**, for "BUG."

14.     On January 9, 2020, case agents utilized CS #1 to conduct a controlled purchase of cocaine from "BUG." CS #1 made a consensually recorded phone call to the **Target Cell Phone #1**. "BUG" answered the phone and CS #1 and "BUG" discussed meeting. "BUG" stated he would be ready in twenty minutes. Next, case agents provided CS #1 with a recording device and a total of $1,000 pre-recorded

6

money for the controlled purchase, and then established surveillance in the meet location of 2100 N. 34th Street, Milwaukee, Wisconsin. CS #1 drove to and parked in the alley of 2100 N. 34th Street, Milwaukee, Wisconsin. Surveillance observed a two-toned silver and blue older Ford pickup truck pull into the alley and park behind CS #1's vehicle. CS #1 exited the vehicle and walked to the driver side door of the Ford pickup truck, where CS #1 remained for only a short period of time. CS #1 got back into his/her vehicle and drove off. Surveillance observed the Ford pickup truck remain at the location and identified an additional suspected drug transaction take place with another individual at the front passenger door of the Ford pickup truck. Case agents believe "BUG" sold narcotics to the other individual.

15.     After the transaction, case agents met with CS #1 and seized the heroin and the recording device. CS #1 also provided the case agents with $20 from the drug purchase as s/he had calculated the amount of narcotics should only cost $980, not $1,000. Case agents field tested the heroin with positive results for heroin and fentanyl and weighed approximately 15.09 grams.

16.     After the controlled purchase, CS #1 was briefed. CS #1 stated s/he parked in the alley in the area of 2100 N 34th Street, Milwaukee, Wisconsin and waited for "BUG." CS #1 contacted "BUG" over the phone as "BUG" was taking a long time to arrive. While waiting for "BUG," CS #1 stated another individual arrived in the alley as "BUG" pulled up in his truck. CS #1 got out of his/her vehicle and walked to the driver's side door of "BUG's" truck. CS #1 gave $980 in pre-

7

recorded law enforcement funds to "BUG." In exchange, "BUG" gave CS #1 the narcotics. CS #1 stated "BUG" kept the narcotics on his lap.

17.     Case agents reviewed the recording from the recording device utilized by CS #1 to confirm his/her purchase of heroin on January 9, 2020 from "BUG."

18.     On January 9, 2020, a case agent showed a single Milwaukee Police Department booking photograph of CURLEE J. ASHFORD (DOB: XX/XX/1966) to CS #1. The photograph was unlabeled and contained no identifying information. CS #1 positively identified the photograph as the person CS #1 knew as "BUG" and the person that sold CS #1 the heroin on January 9, 2020.

19.     On January 22, 2020, case agents utilized CS #1 to conduct a controlled purchase of heroin from "BUG." CS #1 made a consensually recorded phone call to the **Target Cell Phone #2**. "BUG" answered the phone and "BUG" and CS #1 discussed meeting at "BUG's" place. CS #1 told "BUG" to meet at a different location and they both agreed. Shortly after the terminated call, CS #1 made another phone call to the **Target Cell Phone #2** and informed "BUG" CS #1 would meet at "BUG's" apartment instead. Next, case agents provided CS #1 with a recording device and pre-recorded money for the controlled purchase and then established surveillance in the area. CS #1 drove, while being followed by case agents, to the address of 834 N. 35th Street, Milwaukee, Wisconsin. Surveillance observed CS #1 make a U-turn and park south of the address of 834 N. 35th Street, Milwaukee, Wisconsin. CS #1 exited the vehicle and walked to the front door of the listed address. CS #1 waited outside the entry door for a short time before s/he was

8

let in the front door. After approximately seven minutes, surveillance observed CS #1 exit the entry door, walk to CS #1's vehicle, and leave the location. Surveillance followed CS #1 to the meet location. At the meet location, the case agents met with CS #1 and seized the heroin and the recording device. Case agents field tested the heroin with positive results for opiates and fentanyl and weighed approximately 45.49 grams.

20.    After the controlled purchase, CS #1 was briefed. CS #1 stated s/he drove to the address of 834 N. 35th Street, Milwaukee, Wisconsin, parked, and walked to the main entry. CS #1 called "BUG" to let him/her into the building. "BUG" came to the door and let CS #1 in. CS #1 stated they took the elevator up to "BUG's" apartment. "BUG" provided CS #1 with the prepackaged narcotics, and in exchange, CS #1 provided "BUG" with the money. CS #1 then left the apartment, got in the vehicle, and drove to the meet spot.

21.    Case agents reviewed the recording from the recording device utilized by CS #1 to confirm his/her purchase of heroin on January 22, 2020 from "BUG."

22.    Subpoenaed telephone records for the **Target Cell Phone #1** revealed Locus Telecommunications, LLC had no subscriber information for the number. However, CS #1 has contacted ASHFORD at this phone number to purchase narcotics in the past. Toll analysis of the **Target Cell Phone #1** revealed the **Target Cell Phone #1** had contact with CS #1's phone number 77 times between September 30, 2019 and December 30, 2019.

9

23. Subpoenaed telephone records for the **Target Cell Phone #2** revealed Sprint had subscriber Juan Gonzalza, however CS #1 has contacted ASHFORD at this phone number to purchase narcotics in the past. Toll analysis of the **Target Cell Phone #2** revealed the **Target Cell Phone #2** had contact with CS #1's phone number six times on December 18, 2019.

24. Case agents searched law enforcement databases to confirm that **Target Cell Phone #1** is currently being serviced by Locus Telecommunications, LLC.

25. Case agents are requesting this warrant authorizing the disclosure of data related to the **Target Cell Phone #1** and **Target Cell Phone #2** for 30 days to further investigate ASHFORD's activities, and to identify locations to which ASHFORD is traveling to further his drug distribution.

26. In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in

10

rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

## Cell-Site Data

27.     Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about **Target Cell Phone #1** and **Target Cell Phone #2**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

28.     Based on my training and experience, I know that Sprint also can collect per-call measurement data, which Sprint also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

11

## E-911 Phase II / GPS Location Data

29.    I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of **Target Cell Phone #1** and **Target Cell Phone #2**, including by initiating a signal to determine the location of **Target Cell Phone #1** and **Target Cell Phone #2** on the Service Provider's network or with such other reference points as may be reasonably available.

## Pen-Trap Data

30.    Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular

12

network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

## Subscriber Information

31.    Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the

13

information can be used to identify the **Target Cell Phones'** user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

32.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

33.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

34.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of **Target Cell Phone #1** and **Target Cell Phone #2** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

35.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 60 days "after the collection authorized by the warrant

14

has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of **Target Cell Phone #1** and **Target Cell Phone #2** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

36. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate **Target Cell Phone #1** and **Target Cell Phone #2** outside of daytime hours.

15

## ATTACHMENT A

### Property to Be Searched

1.      Records and information associated with the cellular device assigned

**(312) 568-6998** (referred to herein and in Attachment B as the "**Target Cell**

**Phone #2**"), with subscriber, Juan Gonzalza, that is in the custody or control of

Sprint (referred to herein and in Attachment B as the "Provider"), a wireless

communications service provider that is headquartered at 6391 Sprint Parkway,

Overland Park, KS 66251.

2.      **Target Cell Phone #2** for prospective E-911/GPS Data latitude-

longitude information.

1

## ATTACHMENT B

### Particular Things to be Seized

## I.     Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the

possession, custody, or control of the Provider, including any information that

has been deleted but is still available to the Provider or that has been preserved

pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required

to disclose to the government the following information pertaining to the

Account listed in Attachment A:

- a. The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone #1** and **Target Cell Phone #2** for the time period January 9, 2020 to the present:

    - i. Names (including subscriber names, user names, and screen names);

    - ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    - iii. Local and long distance telephone connection records;

    - iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    - v. Length of service (including start date) and types of service utilized;

    - vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital

1

Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by **Target Cell Phone #1** and **Target Cell Phone #2**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT."

b. Information associated with each communication to and from **Target Cell Phone #1** and **Target Cell Phone #2** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phones** will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT."

2

The Court has also issued orders pursuant to 18 U.S.C. § 3123, dated today, under the same docket number, for such information associated with **Target Cell Phone #1** and **Target Cell Phone #2.**

c. Information about the location of **Target Cell Phone #1** and **Target Cell Phone #2** for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information

    i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of **Target Cell Phone #1** and **Target Cell Phone #2** on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

    ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Section 841(1)(1) involving CURLEE J. ASHFORD.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

4

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Sprint, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Sprint. The attached records consist of _____.

I further state that:

a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Sprint and they were made by Sprint as a regular practice; and

b.    such records were generated by Sprint's electronic process or system that produces an accurate result, to wit:

1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Sprint in a manner to ensure that they are true duplicates of the original records; and

1

2.     the process or system is regularly verified by Sprint and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____   _____
Date                 Signature

2

# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

Records and information associated with the cellular
device assigned (312) 568-6998 that is in the custody
or control of Sprint, a wireless communications
service provider that is headquartered at 6391 Sprint
Parkway, Overland Park, KS 66251.

)
)
)
)
)
)

Case No. **20-897M(NJ)**

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person
or property located in the Eastern District of Wisconsin:

See Attachment A

I find that the affidavit(s) or any recorded testimony, establish probable cause to search and seize the person or property described
above and that such search will reveal:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant ON OR BEFORE __February 17, 2020__ *(not to exceed 14 days)*
☐ in the daytime between 6:00 a.m. and 10:00 p.m.     ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required
by law and promptly return this warrant and inventory to _____Hon. Nancy Joseph_____.
*(United States Magistrate Judge)*

☒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
☐ for _____ days (not to exceed 30)     ☒ until, the facts justifying, the later specific date of _____August 3, 2020_____.

Date and time issued: __February 3, 2020 @ 3:00 pm__                    _____
                                                                                                                    *Judge's signature*

City and State: Milwaukee, Wisconsin                    _____Nancy Joseph_____, U.S. Magistrate Judge
                                                                                            *Printed Name and Title*

## ATTACHMENT A

### Property to Be Searched

1.    Records and information associated with the cellular device assigned **(312) 568-6998** (referred to herein and in Attachment B as the "**Target Cell Phone #2**"), with subscriber, Juan Gonzalza, that is in the custody or control of Sprint (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 6391 Sprint Parkway, Overland Park, KS 66251.

2.    **Target Cell Phone #2** for prospective E-911/GPS Data latitude-longitude information.

1

## ATTACHMENT B

### Particular Things to be Seized

## I.    Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the

possession, custody, or control of the Provider, including any information that

has been deleted but is still available to the Provider or that has been preserved

pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required

to disclose to the government the following information pertaining to the

Account listed in Attachment A:

- a. The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone #1** and **Target Cell Phone #2** for the time period January 9, 2020 to the present:

    - i. Names (including subscriber names, user names, and screen names);

    - ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    - iii. Local and long distance telephone connection records;

    - iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    - v. Length of service (including start date) and types of service utilized;

    - vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital

1

Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by **Target Cell Phone #1** and **Target Cell Phone #2**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT."

b. Information associated with each communication to and from **Target Cell Phone #1** and **Target Cell Phone #2** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phones** will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT."

2

The Court has also issued orders pursuant to 18 U.S.C. § 3123, dated today, under the same docket number, for such information associated with **Target Cell Phone #1** and **Target Cell Phone #2.**

c. Information about the location of **Target Cell Phone #1** and **Target Cell Phone #2** for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information

   i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of **Target Cell Phone #1** and **Target Cell Phone #2** on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

   ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

3

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Section 841(1)(1) involving CURLEE J. ASHFORD.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

4